[Cite as *State v. Quinn*, 2026-Ohio-2578.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio

    Appellee

v.

Jeremy J. Quinn, Jr.

    Appellant

Court of Appeals No.  {48}L-25-00280

Trial Court No.  CR0200502529

**<u>DECISION AND JUDGMENT</u>**

Decided: July 7, 2026

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, J.**

**{¶ 1}** Defendant-appellant, Jeremy J. Quinn, Jr., appeals the October 29, 2025 judgment of the Lucas County Court of Common Pleas, denying his motions for funds for an expert witness and for a new trial. For the following reasons, we affirm.

## I.  Background

**{¶ 2}** Following a jury trial that began on November 14, 2005, Jeremy Quinn was convicted of kidnapping and repeatedly raping a 16-year-old girl.  The trial evidence is

summarized in detail in *State v. Quinn*, 2008-Ohio-819 (6th Dist.). Evidence pertinent to Quinn's present appeal is recited below, as is the procedural history of the case.

## A. The Trial Evidence

{¶ 3} Briefly stated, on July 18, 2005, the victim was leaving her Sylvania Township home between 4:00 and 4:15 p.m. for a 4:30 p.m. shift at Southwyck Mall. She got into her car, which was parked in her driveway, and was approached by a black male whom she did not know. At knifepoint, he forced her into the passenger side of the vehicle such that her head was under the dashboard and her legs were on the passenger seat. He drove about three to five minutes and stopped the car in a wooded area. While inside the vehicle, he raped her orally, vaginally, and anally. Outside the vehicle, he raped her again, twice vaginally and once anally. He forced her back into the vehicle where he made her kiss him, sucked on her neck and breasts, licked her vagina, masturbated to ejaculation, then forced her to swallow the ejaculate. Quinn told the victim to get dressed, but she could not get her jeans on because her legs were wet with sweat. He gave her some pants that were in her trunk. Afterward, he drove her to a home around the corner from her house and exited the vehicle. The victim drove home from there.

{¶ 4} When she arrived home, the victim was approached by her neighbor who asked if she had hit her son's vehicle. The victim told the neighbor that she had been raped and the man who raped her hit the vehicle. The neighbor called 9-1-1.

2.

{¶ 5} During the ordeal, the victim observed identifying features about Quinn, including old scratches on his arm and a tattoo of a dog on his chest that said "fear or feel me." She recalled that he brandished a skinny, silver knife and described that he wore navy shorts and a black t-shirt. The victim clearly saw his face and was quickly able to identify him in a photo lineup. The victim's neighbor told police that she had gone out to get the mail around 4:15 p.m. and saw an unfamiliar black male slowly riding a bicycle. She was not able to identify the man, but a bicycle was found next to the victim's house.

{¶ 6} Police went to Quinn's home, about a mile away, and apprehended him. Navy shorts and black t-shirts were seized from Quinn's bedroom; the shorts were wet. He had scratches on his arm and a tattoo of a dog that said "fear or feel me." Later, when a search warrant was executed, a knife matching the description provided by the victim was found during a pat down of Quinn's father. After detectives told Quinn that he was being arrested for rape and kidnapping, Quinn told detectives: "If you ain't got the DNA, motherfucker, you ain't got nothing in your ass."

{¶ 7} The victim underwent a sexual assault examination at Flower Hospital within a few hours of the attack. There were tears in the victim's anus, dirt and debris in her vaginal vault and perineum area, a bruise on her neck, and other abrasions and bruises elsewhere on her body. Her clothes were collected and a rape kit was performed. Swabs were taken from inside her vagina, rectum, and mouth and from her neck, breasts, and hands.

3.

{¶ 8} A forensic scientist at the Bureau of Criminal Investigation performed serological tests of the items submitted in the rape kit, including the swabs and her underwear. Seminal fluid was detected in the vaginal swabs and in the crotch of the victim's underwear. Amylase, a component of saliva, was detected on the victim's underwear and on the swabs from her breast and neck. There was no evidence of semen on vaginal smear slides, rectal samples, oral samples, or swabs collected from the perineum, hand, breasts, or neck. The victim's jeans, top, bra, and pants revealed no semen or saliva.

{¶ 9} DNA analysis was performed on the items that tested positive during serological studies. For the stain on the crotch of the victim's underwear, there was a sperm and non-sperm fraction. In the non-sperm fraction, there was a mixture of DNA profiles consistent with the victim, who was the major contributor, and Quinn, who was a minor contributor. On the sperm fraction of that same stain, there was a mixture of DNA from Quinn, the major contributor (with a frequency of 1 in 187,800,000,000,000), and the victim and an unknown individual, minor contributors. On the swab from the victim's breast, there was a mixture of DNA from Quinn, the major contributor (with a frequency of 1 in 185,500,000,000,000,000), and the victim, a minor contributor. And on the swab of the victim's neck, there was a mixture of DNA from the victim, the major contributor, and Quinn (with a frequency of 1 in 1,197,000) and an unknown individual, both minor contributors. DNA tests were not performed on the vaginal swabs because

4.

the seminal fluid tests that were performed indicated a stronger positive result for the underwear than the vaginal swabs.

{¶ 10} Quinn testified in his own defense. He claimed that he was released from prison on July 14, 2025, after serving 13 months for menacing by stalking and burglary. Upon his release, he visited a Subway restaurant at Central Avenue and McCord Rd., where he allegedly met the victim. He gave her his phone number, which she programmed into her phone, and she called him later that night. Quinn said that the victim called him again two days later, and they met up around 2:30 p.m. that day, and drove to Baskin Robbins.

{¶ 11} According to Quinn, he saw the victim again on July 18, 2005. He said that she called him that day around noon, and he suggested that they rent videos. The victim picked him up and they went to the Family Video at King Road and Bancroft Street. Quinn maintained that after renting videos, the victim dropped him back at his house and said she would return later that day. Around 3:00 p.m., the victim picked him up and took him to her house. He sat on the love seat, and she sat on his lap and kissed him. Quinn claimed that they disrobed down to their underwear, and the victim rubbed his penis between her legs. He told the victim that they needed a condom, and she said she had one in her purse. When she went to get it, her purse fell open and Quinn saw her driver's license, which indicated that she was only 16 years old—he thought she was 19. Quinn maintained that upon discovering her true age, he got dressed to leave. He insisted

5.

that the victim begged him to stay, but he left no later than 4:20 p.m., and walked home through the woods.  Quinn described the layout of the victim's home.

{¶ 12} A sheriff's deputy from the Lucas County jail testified on rebuttal that Quinn asked him questions about whether fingerprints could be lifted from a bicycle. Quinn told the deputy that he had to submit a blood sample, but said that he was not worried about the results because he knew that he had never been at the crime scene. Quinn said that he had been at his girlfriend's house at the time the crime was alleged to have occurred, and he didn't even know the victim.

## B.  The Verdict

{¶ 13} The jury found Quinn guilty of all counts.  The court ordered a presentence investigation and continued the matter for sentencing.  At the sentencing hearing, the trial court imposed prison terms of ten years on each count to be served consecutively.

## C.  The Direct Appeal

{¶ 14} Quinn appealed.  He argued that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.  He claimed that his sentence was excessive, contrary to law, and imposed pursuant to a facially unconstitutional statute.  He argued that trial counsel was ineffective.  And he claimed that prosecutorial misconduct deprived him of a fair trial.

{¶ 15} We affirmed Quinn's convictions.  *Quinn*, 2008-Ohio-819 (6th Dist.).  He did not appeal our decision to the Ohio Supreme Court.  Quinn sought to reopen his

6.

appeal, but we denied his application as untimely. *State v. Quinn,* 2008-Ohio-3579 (6th Dist.).

### D. Post-Conviction Filings

{¶ 16} In 2010, Quinn began his quest to have the vaginal swabs tested for DNA. Since then he has filed at least four unsuccessful motions to have the vaginal swabs tested. This is in addition to numerous other attempts to have his convictions overturned, his case retried, or his sentence reduced on other bases. Eventually, Quinn sought independent testing of the vaginal swabs at his own expense. His motion was granted in a judgment journalized on November 4, 2024. The trial court instructed that Quinn could test only the vaginal swabs, the testing would be conducted solely at Quinn's expense, and the testing would have to be completed and a report provided by April 30, 2025.

{¶ 17} Unfortunately, over the course of almost 20 years and many, many trips between the common-pleas court, the state appellate court, and even the federal courts, the State had trouble tracking down the whereabouts of the swabs. They were eventually located at the Sylvania Township Police Department, but not in time to meet the trial court's April 30, 2025 deadline.

{¶ 18} The DNA testing finally occurred on September 9, 2025. The testing was performed by the Ohio Bureau of Criminal Investigations—the laboratory Quinn designated—and took place at the State's expense. The conclusions reached were that (1) vaginal swabs numbered 3.2.1 and 3.2.2 contain no DNA profile foreign to the victim; (2) the vaginal swabs numbered 3.2.2 contain a Y-STR DNA profile consistent with Quinn—

7.

"neither [Quinn] nor any of his paternal male relatives can be eliminated as the source of the Y-STR DNA profile in the non-sperm fraction. This Y-STR profile has been observed 0 times in the Y-Chromosome Haplotype Database of 29,207 profiles and is not expected to occur more frequently than 1 in 9,750 male individuals in the U.S. population."

{¶ 19} After receiving these results, Quinn, through counsel—he had acted pro se until March 28, 2025, when counsel was appointed at Quinn's request—filed two motions: (1) a motion for funds for expert review of DNA evidence; and (2) a motion for new trial based on new evidence and request for finding that defendant was unavoidably prevented from discovering said evidence.

{¶ 20} In his motion for funds for expert review of the DNA evidence, Quinn asked that he be permitted to retain Julie Heing, Ph.D. He argued that "[w]hile [his] DNA has been located in one fraction of one sample, the results also indicate that the results show no DNA foreign to the victim in the (more generalized) STR DNA test results." He insisted that he needs assistance in "reconciling these results, both to each other, as well as with respect to the original testing." He pointed out that the court had previously deemed him to be indigent.

{¶ 21} The State opposed Quinn's motion on the basis that his motion for independent DNA testing suggested that he had his own funds available for retaining a DNA expert. Because Quinn did not ultimately pay for the DNA testing himself—the State did—the State believed that this meant he continued to have funds available that could be used to pay an expert.

8.

{¶ 22} In his motion for new trial, Quinn argued that he should be granted a new trial under Crim.R. 33(A) and R.C. 2945.80. He sought a finding that he had been "unavoidably prevented . . . from filing his motion for new trial based on new evidence, due to the difficulties with finding, and testing the original rape kit samples, which were arguably in the possession of the State of Ohio the entire time, but not tested either at the time of trial, or at any time before July 2025." He maintained that while the testing results have been received, "the results are arguably confusing[,] if not inconsistent with Defendant's convictions." As he did in his motion for expert funds, Quinn explained that he wished to retain Julie A Heinig, Ph.D., but he said that he was unable to provide information concerning the cost of her services or a timeframe for her review because she had not responded to his request for this information.

{¶ 23} The State opposed Quinn's motion on the basis that (1) he did not first seek leave to file his motion; (2) Quinn knew before trial that the vaginal swabs were not tested, thus he could have sought testing before trial or within 14 days after the verdict; (3) the report from the independent DNA testing identifies Quinn as the source of the DNA discovered in the vaginal swabs, thus it is not exculpatory; and (4) the motion itself admits that Quinn currently has no evidence to support his request for a new trial. "In summation," the State argued, "Quinn filed his Motion for New Trial, out of time, without having filed a Motion for Leave as required by Crim.R. 33, and before having retained, much less consulted an expert, to determine whether or not he even has grounds to claim the right to a new trial."

9.

**{¶ 24}** In a judgment journalized on October 29, 2025, the trial court denied Quinn's motions. The court observed that Quinn had not filed a motion for leave to file his motion for a new trial, "but has asked the court to make a determination that [he] was unavoidably prevented from filing his motion." It concluded that "[w]hether he was [unavoidably prevented from filing his motion] or not," the DNA results are consistent with Quinn's standard and do not exclude him as the perpetrator of the victim's rape. The court recited the evidence that supported Quinn's conviction at trial, including (1) Quinn was found with a knife that matched the knife described by the victim; (2) he was identified by the victim a short time after the rape; (3) he has a unique tattoo that matched the victim's description; and (4) his DNA was found in the victim's undergarments and on her skin. The court acknowledged Quinn's testimony that the victim pursued him, and they engaged in sexual activity, but it emphasized that other testimony at trial indicated that he denied knowing the victim and could not have been the perpetrator because he was having sex with his girlfriend at the time the victim claims the rape occurred.

**{¶ 25}** Under these facts, the court found that the new DNA evidence was not outcome determinative, and a motion for new trial, "whether preceded by leave or not," would be "otiose"—i.e., futile. It denied both of Quinn's motions.

**{¶ 26}** Quinn appealed. He assigns the following error for our review:

> The trial court abused its discretion when it denied Appellant's request for expert funds to review the results of DNA testing associated with a 20-year old rape kit, and a trial/hearing to receive the results, when the 2025 testing arguably produced results which require expert review and/or explanation.

## II. Law and Analysis

{¶ 27} Quinn challenges the trial court judgment denying his motion for expert funds and his motion for new trial. Both challenges are reviewed for an abuse of discretion. *See State v. McAlpin*, 2026-Ohio-148, ¶ 14 (new trial); *State v. Peterson,* 2023-Ohio-3544, ¶ 38 (6th Dist.) (funds for expert). An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). An unreasonable decision is one that lacks sound reasoning to support the decision. *Hageman v. Bryan City Schools*, 2019-Ohio-223, ¶ 13 (10th Dist.). "An arbitrary decision is one that lacks adequate determining principle and is not governed by any fixed rules or standard." *Id.*, quoting *Porter, Wright, Morris & Arthur, LLP v. Frutta del Mondo, Ltd.*, 2008-Ohio-3567, ¶ 11 (10th Dist.). And an unconscionable decision is one "that affronts the sense of justice, decency, or reasonableness." *Id.*

{¶ 28} We separately address the trial court's denial of Quinn's motion for expert funds and his motion for new trial.

### A. The Motion for Funds for Expert Review

{¶ 29} The trial court granted Quinn's motion for independent DNA testing, and in doing so, made clear that this testing would be permitted "solely at Defendant's expense." Now that this testing has taken place, Quinn argues that the trial court erred by denying his request for funds to hire an expert to interpret the results of the DNA testing. He maintains that expert assistance is needed to explain the test results, and he should be

11.

afforded "an avenue to investigate and then to air differences of opinion" concerning those results. Quinn insists that the judgment approving the DNA testing of the vaginal swabs fails to address a method for determining and arguing the significance of the results. He contends that without an expert, he is unable "to argue the technical validity" of the results "with a nuanced understanding" of what he claims are inconsistencies with the results of the 2005 testing. Quinn also claims that an expert is needed to opine on chain-of-custody issues given the State's difficulty in locating the vaginal swabs 20 years post-trial.

{¶ 30} The State responds that (1) Quinn has failed to make a particularized showing of a reasonable probability that the requested expert would have aided in his defense; (2) the new test results were not inconsistent with the trial evidence or the 2005 testing; (3) no evidentiary hearing was required because the results of the independent DNA testing were not outcome determinative, as they did not exclude or exonerate Quinn—Quinn's DNA was found on the swab taken from inside the victim's vagina; (4) the DNA swabs were in the possession of the Sylvania Township Police Department all along; and (5) the State does not believe that Quinn is indigent.

{¶ 31} Quinn cites *Ake v. Oklahoma*, 470 U.S. 68 (1985), as support for his motion. *Ake* recognized that "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense," which, in some cases, may include access to expert assistance. *Id.* at 77. Relying on *Ake,* the Ohio Supreme Court

12.

explained in *State v. Mason*, 82 Ohio St.3d 14 (1998), syllabus, that due process may in fact require that an indigent criminal defendant be provided funds to obtain expert assistance at the State's expense if "the trial court finds, in the exercise of sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial."

{¶ 32} But Quinn fails to appreciate that the present matter was before the court *post-conviction*. In preparing for his criminal *trial*, Quinn requested and was granted funds for a DNA expert in a judgment journalized on September 26, 2005. He received the BCI reports in pretrial discovery and was on notice then which samples were tested— or not tested—for DNA evidence. Indeed, the State's BCI witness was questioned at length concerning the decision not to test the vaginal swabs. Quinn was provided the "raw materials" needed to defend himself at trial and the court's decision denying him expert funds post-conviction did not render the proceedings "unfair." *See State v. Murphy,* 1987 WL 19835, *3 (5th Dist. Oct. 29, 1987) (observing that "[p]ost-conviction relief proceedings are civil in nature," thus "appellant [wa]s not entitled to funds which he might otherwise be in a criminal proceeding[].").

{¶ 33} In any event, the trial court made clear in its decision granting Quinn's motion for independent testing that Quinn would be "solely" responsible for the costs associated with his request. Although not specifically outlined in the court's November

13.

4, 2024 judgment, Quinn should have reasonably understood that he would also be responsible for any costs associated with interpreting the results of the testing.

{¶ 34} Finally, one of the factors to be considered in determining whether a trial expert must be provided for an indigent defendant is the burden on the State. *Mason* at 149. Here, Quinn failed to provide basic information supporting his request for expert funds. He filed his motion before assuring that his proposed expert would accept review, how much that review would cost, and when a review could be completed. Quite simply, Quinn failed to present the court with any information pertinent to this factor. The trial court did not abuse its discretion when it denied Quinn's motion for expert funds.

### B. The Motion for New Trial

{¶ 35} Quinn moved the trial court "for a new trial for the purpose of exploring and explaining th[e] DNA evidence." In his brief on appeal, Quinn focuses primarily on the denial of his motion for expert funds, but adds that "this court should also reverse the court's denial of a request for a trial, perhaps better understood to be a hearing." Likely because Quinn has focused his appellate argument on the denial of his motion for expert funds, the State does not specifically respond to Quinn's arguments concerning the denial of his motion for a new trial. As Quinn's motion in the trial court sought a new trial—not an evidentiary hearing—we will confine our review to the relief sought by Quinn in the trial court.

{¶ 36} Under Crim.R. 33(A)(6), "[a] new trial may be granted on motion of the defendant" for certain causes "affecting materially the defendant's substantial rights,"

14.

including "[w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." "When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given. . . ." Crim.R. 33(A)(6). "[T]he defendant must show that the newly discovered evidence discloses a strong probability that it will change the result if a new trial is granted and that it is not merely cumulative to former evidence." (Internal quotations and citations omitted.) *State v. Hatton,* 2022-Ohio-3991, ¶ 28.

{¶ 37} Even though the results of the 2025 testing indicated that Quinn could not be eliminated as the source of the Y-STR DNA, Quinn's motion for new trial claimed that the DNA results were "confusing, if not inconsistent"—not that the evidence "discloses a strong probability that it will change the result if a new trial is granted." This by itself would necessitate denial of Quinn's motion. But Quinn's motion suffers from a more fundamental flaw: he failed to seek leave to file a motion for new trial.

{¶ 38} A motion for new trial based on newly-discovered evidence must be filed within 120 days of the verdict, however, "[i]f it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period." Crim.R. 33(B).

15.

**{¶ 39}** Where a defendant desires to file a motion for new trial based on newly-discovered evidence after the 120-day deadline established in Crim.R. 33(B), he must seek and be granted leave to do so. It is a two-step process. *Hatton* at ¶ 29. He must "first establish[] by clear and convincing evidence that he was unavoidably prevented from discovering the evidence within the 120-day period." *Id.* Then, "[i]f the trial court determines that the defendant has met that burden and grants a motion for leave to file a motion for a new trial," the defendant must file his motion within seven days. *Id.*

**{¶ 40}** "A defendant's failure to obtain leave to file an untimely motion for a new trial is a sufficient reason to affirm a trial court's denial of a motion for new trial." *State v. McAlpin,* 2026-Ohio-148, ¶ 23, citing *State v. Norman*, 2005-Ohio-5087, ¶ 8, (10th Dist.).

**{¶ 41}** Within Quinn's motion for new trial, he claimed that he was "unavoidably prevented *from filing this motion previously*." First, this is not the standard. The rule requires him to show that he was unavoidably prevented *from discovering the evidence* within 120 days of the verdict. Given that discovery materials and the BCI witness' trial testimony alerted him to which evidence was tested and why, Quinn would likely not meet this standard.

**{¶ 42}** Second, and even more basic, Quinn altogether skipped the first step of the two-step process by failing to seek leave to file his motion for new trial. "When a defendant seeks leave to file a motion for a new trial under Crim.R. 33(B), the trial court may not consider the merits of the proposed motion for a new trial until after it grants the

16.

motion for leave." *Hatton*, 2022-Ohio-3991, ¶ 30, citing *State v. Bethel*, 2022-Ohio-783, ¶ 41.  Recently, in *McAlpin*, the Ohio Supreme Court made clear that even where the trial court proceeds to consider the substance and deny the motion for new trial on its merits—as opposed to denying the motion for failure to seek leave—an appellate court is bound to affirm that denial if the defendant "fails to comply with the necessary procedural steps set forth in Crim.R. 33(B)." *McAlpin* at ¶ 23.  Here, Quinn failed to comply with the procedural steps set forth in Crim.R. 33(B).  We are, therefore, bound to affirm the trial court's decision denying his motion for new trial.

{¶ 43} We find Quinn's assignment of error not well-taken.

### III.  Conclusion

{¶ 44} The trial court did not abuse its discretion when it denied Quinn's motion for funds for a DNA expert.  First, before his 2005 trial, Quinn requested and was granted funds for a DNA expert, and he was on notice before trial which samples were tested—or not tested—for DNA evidence.  Second, the trial court made clear when it granted Quinn's motion for independent testing that Quinn would be "solely" responsible for costs associated with his request, which he should have understood included any costs for interpreting test results.  Finally, Quinn's motion lacked basic information to support his request for expert funds, including whether his proposed expert would accept review, how much that review would cost, and when a review could be completed.

{¶ 45} The trial court did not abuse its discretion when it denied Quinn's motion for a new trial.  Even setting aside the fact that Quinn claimed only that the DNA results

were "confusing, if not inconsistent"—not that the evidence "discloses a strong probability that it will change the result if a new trial is granted"—Quinn failed to seek leave to file his motion, thus he did not comply with the procedural steps under Crim.R. 33(B). As such, we are bound to affirm the trial court's decision denying his motion for new trial.

{¶ 46} We affirm the October 29, 2025 judgment of the Lucas County Court of Common Pleas. Quinn is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27.

Thomas J. Osowik, P.J.

_____
JUDGE

Christine E. Mayle, J.

Charles E. Sulek, J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.